UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
MAR 1 9 2020
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

JULIE L., *individually and as guardians of Q.M.,*
*a minor,* and RICHARD M., *individually and as*
*guardians of Q.M., a minor,*

Plaintiffs,

v.

EXCELLUS HEALTH PLAN, INC., doing
business as EXCELLUS BLUECROSS
BLUESHIELD and THE UNIVERSITY
OF ROCHESTER HIGH DEDUCTIBLE
HEALTH PLAN,[1]

Defendants.

**DECISION AND ORDER**

6:18-CV-06753 EAW

## **INTRODUCTION**

Plaintiffs Julie L. and Richard M. (collectively, "Plaintiffs") filed this action against

defendants Excellus Health Plan, Inc., doing business as Excellus BlueCross BlueShield

("Excellus") and the University of Rochester High Deductible Health Plan ("the Plan")

(collectively, "Defendants"), on behalf of Q.M., their minor child. (Dkt. 1). Q.M. has a

long history of mental health issues. (*See* Dkt. 62 at 3-4). Q.M. received services from

BlueFire Wilderness Therapy ("BlueFire") and Boulder Creek Academy ("BCA"). (Dkt.

---

[1]     At oral argument held on December 4, 2019, the parties agreed that Defendants
should be properly named as Excellus Health Plan, Inc., doing business as Excellus
BlueCross BlueShield and the University of Rochester High Deductible Health Plan.
Accordingly, the Clerk of Court is hereby directed to amend the caption as noted.

60-3 at 2, 5). Excellus denied Plaintiffs' requests for coverage of both services. (Dkt. 65-2 at 157-62; Dkt. 65-5 at 120-24).

Plaintiffs' Second Amended Complaint alleges two causes of action: (1) a claim pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking recovery of benefits owed to Q.M. under the Plan; and (2) a claim alleging violation of the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"), pursuant to 29 U.S.C. § 1132(a)(3). (Dkt. 52).

Both parties moved for summary judgment. (Dkt. 60; Dkt. 63). Based on the record before the Court, the Court finds Excellus's determinations that services at BlueFire and BCA were not medically necessary were not arbitrary and capricious. Additionally, the Court finds there are no genuine issues of material fact as to Plaintiffs' Parity Act claim. Accordingly, the Court grants Defendants' motion for summary judgment (Dkt. 60), and denies Plaintiffs' motion for summary judgment (Dkt. 63).

## BACKGROUND

### I.    Factual Background

#### A.    The Plan

Q.M. is a covered beneficiary under the Plan,[2] which is a self-funded employee welfare benefits plan. (Dkt. 60-3 at ¶¶ 3, 4; Dkt. 70 at ¶¶ 3, 4). Excellus is a third-party claims administrator of the Plan, pursuant to the terms of the Administrative Services Contract ("ASC"). (Dkt. 60-3 at ¶ 5; Dkt. 70 at ¶ 5). The Plan states that it "will provide

---

[2]    Q.M.'s mother, Julie L., is employed by the University of Rochester and is a participant in the Plan. (Dkt. 60-3 at ¶ 2; Dkt. 70 at ¶ 2).

coverage for the covered benefits described in [its] Booklet as long as the hospitalization, care, service . . . [or] treatment, is Medically Necessary." (Dkt. 65-1 at 19). The Plan also provides that Excellus "will decide whether care was Medically Necessary," and in making that determination, Excellus may consider:

A.  Reports in peer reviewed medical literature;
B.  Reports and guidelines published by nationally recognized health care organizations that include supporting scientific data;
C.  Professional standards of safety and effectiveness, which are generally recognized in the United States for diagnosis, care, or treatment;
D.  The opinion of health professionals in the general recognized health specialty involved;
E.  The opinion of the attending Professional Providers, which have credence but do not overrule contrary opinions; and
F.  Any other relevant information brought to its attention.

(*Id.*). Additionally, under the terms of the Plan, services are "medically necessary" only if:

A.  They are appropriate and consistent with the diagnosis and treatment of your medical condition;
B.  They are required for the direct care and treatment or management of that condition;
C.  If not provided, your condition would be adversely affected;
D.  They are provided in accordance with community standards of good medical practice;
E.  They are not primarily for the convenience of you, your family, the Professional Provider, or another provider;
F.  They are the most appropriate service and rendered in the most efficient and economical way and at the most economical level of care which can safely be provided to you; and
G.  When you are an inpatient, your medical symptoms or conditions are such that diagnosis and treatment cannot safely be provided to you in any other setting (e.g., outpatient, physician's office, or at home).

(*Id.* at 19-20).

## B.      Q.M.'s Treatment History

The following facts are taken from Plaintiffs' letter submitted to Excellus as a part of their appeal of the denials of BlueFire and BCA services. Q.M. received mental health treatment since the age of four, and prior to entering BlueFire, Q.M. received mental health care from seven psychologists and four psychiatrists. (Dkt. 65-5 at 3). Q.M.'s history of diagnoses include: attention-deficit hyperactivity disorder; generalized anxiety disorder; oppositional defiant disorder; narcissistic personality disorder traits; borderline personality disorder traits; Tourette syndrome/tic disorder; and dysgraphia/impairment in written expression. (Dkt. 65-2 at 8).

In December 2015, Q.M. was admitted to the Child and Adolescent Hospitalization Program at Strong Behavioral Health after showing aggressive behaviors at home. (*Id.* at 22). Upon Q.M.'s discharge from the hospital in January 2016, Q.M.'s high school's Committee on Special Education decided it would be best to place Q.M. at a therapeutic day school, where Q.M. would receive personalized instruction and individualized and group counseling. (*Id.* at 46). Q.M. attended the therapeutic day school until April 15, 2016. (*Id.*).

Sometime in April 2016, Plaintiffs found Q.M.'s Instagram messages showing he was attempting to purchase a hand gun. (*Id.* at 143). Plaintiffs reported this to the police and upon the police's arrival, Q.M. implored they "shoot [him]." (*Id.*; Dkt. 65-3 at 27). The police made a mental hygiene arrest and admitted Q.M. to a psychiatric unit. (Dkt. 65-2 at 143). As a result, Plaintiffs subsequently entered Q.M. into BlueFire on April 20, 2016. (*Id.*).

## C.  BlueFire Services

Q.M. resided at Bluefire between April 20, 2016, and June 29, 2016.  (Dkt. 60-3 at ¶ 7; Dkt. 70 at ¶ 7).  Bluefire is an "outdoor behavioral program for teens and young adults with mental health or substance abuse problems" located in Idaho.  (Dkt. 52 at 1; Dkt. 60-3 at ¶ 8; Dkt. 70 at ¶ 8).  While at BlueFire, Q.M. received equine, individual, and group therapy.  (*See* Dkt. 65-2 at 51-89).

On October 26, 2016, Plaintiffs requested authorization for BlueFire services.  (*See* Dkt. 65-1 at 199).  On November 7, 2016, Excellus issued an Initial Adverse Determination denying the BlueFire services as not medically necessary.  (Dkt. 60-3 at ¶ 9; Dkt. 70 at ¶ 9).  Excellus cited the InterQual Level of Care Criteria ("InterQual Criteria"),[3] which provides:

> mental health residential treatment is considered medically necessary when a member's clinical documentation shows clinical indications supporting a current mental health disorder with severe symptoms requiring long-term

---

[3]     The InterQual Criteria are nationally recognized, third-party guidelines designed to "help healthcare organizations assess the safest and most clinically appropriate care level for more than 95% of reasons for admission."  Change Healthcare, *InterQual Level of Care Criteria*, https://www.changehealthcare.com/solutions/interqual/level-of-care-criteria.

As noted by Plaintiffs (Dkt. 72 at 6), these types of guidelines have been found to be appropriately relied on by plan administrators.  *See Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, 877 F.3d 687, 690 (6th Cir. 2017) ("To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines.  Both were developed by independent companies with no financial interest in admitting more inpatients than outpatients.  The InterQual Criteria were written by a panel of 1,100 doctors and reference 16,000 medical sources."); *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 114 (1st Cir. 2017) ("BCBS reviewers reasonably consult the InterQual Criteria, which are nationally recognized, third-party guidelines.  The criteria provide a sensible structure for analyzing a patient's particular symptoms, diagnoses, risks, and circumstances to determine what level of medical care is medically necessary.").

treatment that can not be managed at a less intensive level of care. Clinical must also include specific symptoms or behaviors indicating social risk factors over [the] past month. Additionally, members must have no one that can safely provide support outpatient.

(Dkt. 65-1 at 199). Excellus noted that the clinical information did "not indicate a severe mental health disorder with symptoms," nor did it indicate "that there was any substance abuse and/or illegal activity, such as arrest, in the one week prior to admission." (*Id.* at 200). Excellus further noted that "the family was very supportive," and that it was "not clear . . . that [Q.M.] could not have been managed successfully in a less structured level of care, such as mental health partial hospitalization treatment." (*Id.*). Plaintiffs' request was denied as "not medically necessary at this time." (*Id.* at 199).

Plaintiffs appealed the Initial Adverse Determination on May 1, 2017. (Dkt. 60-3 at ¶ 12; Dkt. 70 at ¶ 12). Excellus upheld the adverse determination in its June 3, 2017, Final Adverse Determination and October 5, 2017, corrected Final Adverse Determination. (Dkt. 60-3 at ¶¶ 13, 14; Dkt. 70 at ¶¶ 13, 14). Excellus again stated that the clinical information provided by BlueFire did not satisfy the InterQual Criteria, and that "[t]here was no evidence . . . the current psychiatric diagnosis was unable to be managed safely at a less intensive level of care." (Dkt. 65-2 at 102). Additionally, Excellus noted that BlueFire did not meet InterQual's minimum requirements for Adolescent and Child Psychiatry Mental Health Residential Treatment Programming, noting that QM: did not have a "multidisciplinary team plan in one week"; did not undergo a psychiatric evaluation within the first 24 hours and weekly thereafter; and did not undergo a psychosocial assessment within 48 hours of admission. (*Id.*). However, recognizing Q.M.'s condition

required "both individual and group therapy," Excellus offered "to provide coverage for psychiatric visits if billed separately from the residential component." (*Id.* at 103).

Plaintiffs requested an Independent External Review on September 27, 2017. (*Id.* at 106). An expert reviewer at Independent Medical Expert Consulting Services, Inc. ("IMEDECS"), an independent review organization, evaluated Plaintiffs' BlueFire claims and upheld the denial. (*Id.* at 157). The reviewer cited the Plan's "medical necessity" criteria, noting that there was no evidence an "evaluation took place either before or during [Q.M's] time at BlueFire," nor did it "appear that any other diagnoses were considered that could fully explain [Q.M.'s] long history of disruptive and oppositional behaviors." (*Id.* at 161). The reviewer also cited the InterQual Criteria, noting that "[d]ue to the paucity of notes, it is not exactly clear what symptoms were present prior to either of [Q.M.'s] psychiatric hospitalizations." (*Id.*). Additionally, the reviewer noted that Q.M.'s diagnoses and prescribed medications "[did] not fully match what was listed in [BlueFire's] available discharge summary," and that there was no information regarding Q.M.'s "mood, affect and thoughts of suicidal or homicidal ideation." (*Id.*). As a result, the reviewer concluded there was a "lack of supporting information to suggest that [Q.M.'s] symptoms could only be managed in a wilderness program." (*Id.*).

**D.    BCA Services**

After his discharge from BlueFire, Q.M. resided at BCA for almost one year— between June 29, 2016, and June 5, 2017. (Dkt. 60-3 at ¶ 26; Dkt. 70 at ¶ 26). BCA is a "therapeutic boarding school specializing in treating adolescents between the ages of 13-18 with academic, behavioral, and mental health challenges," also located in Idaho. (Dkt.

60-3 at ¶ 26; Dkt. 70 at ¶ 26). While at BCA, Q.M. attended academic classes and received individual and group therapy. (Dkt. 65-3 at 57-250; Dkt. 65-4 at 1-117).

On December 9, 2016, Plaintiffs requested authorization for BCA services. (*See* Dkt. 65-3 at 16). On December 20, 2016, Excellus issued an Initial Adverse Determination denying the BCA services as not medically necessary. (Dkt. 60-3 at ¶ 28; Dkt. 70 at ¶ 28). Excellus cited the InterQual Criteria, noting that the clinical information provided by BCA did not provide "enough information to determine that [Q.M.] could not have been managed at a lower level of care," and that it was "very limited regarding the reason for admission or to assess the need for ongoing services at the residential treatment level of care." (Dkt. 65-3 at 16-17). Specifically, there were no "details of behavioral control, level of hostile interactions, level of refractory medication treatment or level of function specifics to demonstrate why the admission to [BCA] was medically necessary." (*Id.* at 17).

Plaintiffs appealed the Initial Adverse Determination on June 7, 2017. (Dkt. 60-3 at ¶ 30; Dkt. 70 at ¶ 30). Excellus issued a Final Adverse Determination on June 24, 2017, upholding the adverse determination. (Dkt. 60-3 at ¶ 31; Dkt. 70 at ¶ 31). Excellus noted that BCA did "not meet the criteria for a residential treatment program; it is not licensed by an office of mental health in Idaho, and it is not CARF (Commission of Rehabilitation Facilities) or JACHO (Joint Committee for Accreditation of Healthcare Organizations) certified and [BCA] call[ed] themselves a school." (Dkt. 65-4 at 231). Excellus also noted that BCA's "staffing and therapy notes are sparser than would demonstrate the expectations of levels of mental health group and/or individual therapy." (*Id.*). Excellus concluded the

- 8 -

"facility [did] not meet the criteria of, nor [were] they providing mental health treatment," and denied the services as not "medically necessary." (*Id.*).

Plaintiffs requested an Independent External Review on October 16, 2017. (Dkt. 65-5 at 2). An IMEDECS expert reviewer evaluated Plaintiffs' BCA claims and upheld the denial of coverage. (*Id.* at 120). The reviewer concluded the services were not medically necessary, noting:

> [Q.M.] had been through a wilderness program for 4 weeks prior to admission and his aggression had decreased. [Q.M.] was not actively suicidal, homicidal or psychotic on admission. He was motivated for treatment and his family was supportive. While at the facility, he was actively engaged in treatment, family was involved and supportive and he was medication compliant. [Q.M.] did go to group, individual and family therapy while in residential treatment and was generally in behavioral control. He was working on coping skills for mood and social skills. [Q.M.] went on multiple passes with family which generally went well. There were no other acute medical concerns. There were no acute substance abuse concerns. He had one episode of property destruction while there, but [Q.M.] was not engaging in severe crisis behaviors to warrant around the clock monitoring from 6/30/16-6/5/17.

(*Id.* at 124).

## II.    **Procedural Background**

Plaintiffs commenced this action on April 20, 2018, in the United States District Court for the District of Utah. (Dkt. 2). On October 5, 2018, Plaintiffs filed a stipulated motion to change venue. (Dkt. 18). The District Court in Utah granted the motion and ordered the case transferred to this District. (Dkt. 19). On October 29, 2018, the case was reassigned to the undersigned. (Dkt. 22).

Defendants moved for summary judgment on July 31, 2019 (Dkt. 60), and Plaintiffs moved for summary judgment on August 1, 2019 (Dkt. 63). On August 28, 2019, both

parties responded in opposition. (Dkt. 68; Dkt. 69). On September 11, 2019, both parties filed replies. (Dkt. 71; Dkt. 72). Oral argument was held before the undersigned on December 4, 2019, and the Court reserved decision. (Dkt. 75).

## DISCUSSION

### I.   Standard of Review for Denial of Benefits Claim

In an ERISA benefits claim, "the court must first determine the standard of review governing plaintiff's denial of disability benefits under the Plan." *Olabopo v. 1199 SEIU*, No. 10-CV-1317 (DLI)(LB), 2011 WL 1204749, at *3 (E.D.N.Y. Mar. 29, 2011). "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Under the latter scenario, "denials may be overturned as arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (quotation omitted). Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation omitted).

"The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243,

249 (2d Cir. 1999) (citation omitted). Under the deferential arbitrary and capricious standard of review, courts are limited to the administrative record, *Miller*, 72 F.3d at 1071, and may not "substitute [their] own judgment for that of the [plan administrator] as if they were considering the issue of eligibility anew," *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). "In short, the question is not whether the record would have permitted a plan administrator to find otherwise, but whether the record compelled the different conclusion urged by [plaintiff]." *Kruk v. Metro. Life Ins. Co.*, 567 F. App'x 17, 20 (2d Cir. 2014).

Here, the parties disagree on the applicable standard of review. Plaintiffs argue the *de novo* standard of review is appropriate because there is no explicit language in the Plan demonstrating that Excellus retained discretionary authority to interpret the terms of the Plan. (Dkt. 62 at 8). Plaintiffs argue that the only language that could be construed to convey such authority is found in the ASC, which is inadequate because only the language contained in the Plan itself may confer such authority. (*Id.* at 8-10). By contrast, Defendants cite *Thurber v. Aetna Life Insurance Co.*, 712 F.3d 654, 659 (2d Cir. 2013), *abrogated on other grounds by Montanile v. Bd. of Trs. of the Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016), and argue that language in the ASC may confer discretionary authority. (Dkt. 68-1 at 6). Defendants also argue that there is sufficient language in the Plan itself to confer discretionary authority. (*Id.* at 7).

The Court concludes that the Plan plainly and clearly grants discretion to Excellus as the Plan Administrator, and thus the arbitrary and capricious standard of review applies.

Under Section Eighteen – General Provisions, part 11 "Eligibility for Benefits," the Plan provides:

> *A determination by [Excellus]* with respect to eligibility for benefits under this Program or the construction of any of the terms of this Program which may apply in any way to any claim you might make, or any rights you might have, under this Program *shall be final and binding on you so long as the determination or construction is not arbitrary and capricious.*

(Dkt. 65-1 at 97 (emphasis added)). Similar language conveying final decision-making authority to the administrator has been found to warrant arbitrary and capricious review. *See, e.g., Pagan*, 52 F.3d at 441 (denial of benefits reviewed under arbitrary and capricious standard of review where plan included the following language: "[The Committee] shall determine *conclusively* for all parties all questions arising in the administration of the [Plan] and any decision of such Committee shall *not be subject to further review.* . . . [The Committee] shall serve as the *final* review committee, under the [Plan], for the review of all . . . claims by participants." (emphasis added)); *E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348, 359 n. 4 (D. Conn. 2017) ("We have the sole and exclusive discretion to . . . [i]nterpret Benefits under the Policy," "[i]nterpret the other terms, conditions, limitations and exclusions set out in the Policy," and "[m]ake factual determinations relating to the Policy and its Benefits"); *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 508 (S.D.N.Y. 2015) ("[T]he Plan provides that Oxford has discretion to deny coverage for any health care service that it determines, in its 'sole judgment,' to not be medically necessary."), *aff'd*, 644 F. App'x 81 (2d Cir. 2016).

Additionally, under Section Eighteen, part 19 "Right to Develop Guidelines and Administrative Rules," the Plan provides that Excellus "may develop or adopt standards

which describe in more detail when payments will or will not be made under the [Plan],"
and that Excellus "shall have all the powers necessary or appropriate to carry out [its]
respective duties in connection with the administration of the [Plan]." (Dkt. 65-1 at 100).
Similar language conveying to the administrator the authority to adopt standards relevant
to the administration of the plan has been found sufficient to warrant arbitrary and
capricious review. *See, e.g., Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d
Cir. 2007) (denial of benefits reviewed under arbitrary and capricious standard of review
where plan included the following language: "[The Administrator] may adopt reasonable
policies, procedures, rules, and interpretations to promote the orderly and efficient
administration of this Certificate."); *Benjamin v. Oxford Health Ins., Inc.*, No. 3:16-cv-
00408 (CSH), 2018 WL 3489588, at *6 (D. Conn. July 19, 2018) (same language as in
*Krauss*); *Dorato v. Blue Cross of Western New York, Inc.*, 163 F. Supp. 2d 203, 210
(W.D.N.Y. 2001) ("We may develop or adopt standards which describe in more detail
when we will make or will not make payments under this Contract . . . We shall have all
the powers necessary or appropriate to enable us to carry out our duties in connection with
the administration of this Contract. . . .").

Plaintiffs cite *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813
F.3d 420 (1st Cir. 2016) to argue the language contained in the Plan does not confer
arbitrary and capricious review. (Dkt. 69 at 6-7). In *Stephanie C.*, the language at issue
provided that "[the Administrator] decides which health care services and supplies that you
receive (or you are planning to receive) are medically necessary and appropriate for
coverage." *Id.* at 428. The First Circuit found this language to "restate[] the obvious: that

no benefits will be paid if [the Administrator] determines they are not due" because all plans "require an administrator first to determine whether a participant is entitled to benefits before paying them." *Id.* (citation omitted). In contrast, here, the language provides that Excellus's determination would be "final and binding" as long as it "is not arbitrary and capricious." (Dkt. 65-1 at 97). This language plainly and clearly contemplates an eligibility determination beyond the initial determination, unlike the language in *Stephanie C.* As such, *Stephanie C.* is distinguishable. Accordingly, the Court finds the arbitrary and capricious standard of review applies.

## II. Excellus's Denials of Benefits for BlueFire and BCA Services Were Not Arbitrary and Capricious

Plaintiffs argue that Excellus's reliance on the InterQual Criteria in determining that BlueFire and BCA services were not medically necessary was in error because where "undisclosed external medical necessity criteria are at odds with the actual terms of the Plan, the language of the Plan documents must prevail." (Dkt. 69 at 7-8). Plaintiffs assert that had Excellus relied on the Plan's medical necessity criteria and not the InterQual Criteria, Excellus would have found BlueFire and BCA services were medically necessary. (*See* Dkt. 72 at 6-7).

As an initial matter, the InterQual Criteria are not undisclosed. The Plan expressly permits Excellus to consider such criteria when determining whether a service is medically necessary. (*See* Dkt. 65-1 at 19 (in determining medical necessity, Excellus may review "[r]eports and guidelines published by nationally recognized health care organizations that include supporting scientific data")).

Turning to the specifics of Plaintiffs' arguments, Plaintiffs do not identify how the Plan's medical necessity criteria conflict with the InterQual Criteria.[4] Upon its own review, the Court finds the Plan's criteria are consistent with the InterQual Criteria. (*Compare* Dkt. 65-1 at 199 (InterQual Criteria, in part, require that "member's clinical documentation shows clinical indications supporting a current mental health disorder with severe symptoms requiring long-term treatment that can be managed at a less intensive level of care"), *with id.* at 20 (medical necessity criteria under the Plan requires, in part, "[w]hen you are an inpatient, your medical symptoms or conditions are such that diagnosis and treatment cannot safely be provided to you in any other setting")). The mere fact that the InterQual Criteria includes criteria not articulated in the Plan does not mean that the

---

[4]     Plaintiffs cite *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019) to argue Excellus improperly relied on the InterQual Criteria. (Dkt. 72 at 7). *Wit* does not support Plaintiffs' argument. In *Wit*, the defendant's internally-developed guidelines were found to deviate from the accepted standards of care through its: "presenting problems requirement," which required that "upon admission, there . . . be a reasonable expectation that services will improve the member's 'presenting problems' within a reasonable time"; and "why now requirement," which required the "reason [why] the patient required a higher level of care," separate and apart from showing that the patient "could not be 'treated in a less intensive setting.'" *Id.* at *26. The defendant's internally-developed guidelines were found to have prioritized cost-cutting over the interests of plan members. *Id.* at *53. In fact, there was evidence that the defendant had "included administrators from its Finance and Affordability Departments on the committees that ultimately approve[d] [its] [g]uidelines." *Id.* at *53.

Here, Plaintiffs do not argue that the terms of the Plan's medical necessity criteria or the InterQual Criteria similarly require acute symptoms like the "presenting problems" and "why now" requirements in *Wit*. Additionally, in *Wit*, reliance on nationally recognized third-party guidelines was not at issue. In fact, the *Wit* guidelines were found to have deviated from the accepted standard of care, which was properly interpreted by "consensus guidelines from professional organizations," among other sources. *Id.* at *14-15. As such, Plaintiff's reliance on *Wit* for the proposition that Excellus improperly relied on the InterQual Criteria is misplaced.

InterQual Criteria are more restrictive. The Plan provides that services are medically necessary when "appropriate and consistent" with the treatment of the condition and "in accordance with community standards of good medical practice." (Dkt. 65-1 at 19-20). As such, the InterQual Criteria help interpret what treatment is "appropriate and consistent" and "in accordance with community standards."

Excellus determined BlueFire's services were not medically necessary because there was no clinical indication demonstrating: (1) Q.M.'s current psychiatric diagnosis could not be managed safely at a less intensive level of care; and (2) specific symptoms or behaviors indicating social risk factors over the past month. (Dkt. 65-2 at 102). Moreover, Excellus noted there was "no documentation of a psychiatric evaluation within the first 24 hours and weekly thereafter." (*Id.*).

The reasonableness of Excellus's denial is confirmed by the external review sought by Plaintiffs, which upheld the denial of coverage. (Dkt. 65-2 at 157-62). *See S.M. v. Oxford Health Plans*, 644 F. App'x 81, 84 (2d Cir. 2016) ("The reasonableness of this decision is further confirmed by the external review sought by [the plaintiff], which agreed with Oxford's denial of coverage."); *Halberg v. United Behavioral Health*, No. 16-CV-6622 (MKB) (SJB), 2019 WL 4784571, at *19 (E.D.N.Y. Sept. 30, 2019) ("That MCMC, an independent and external reviewer, upheld Defendant's decision further demonstrates that Defendant acted reasonably."). The reviewer is a "medical doctor (MD) board certified in psychiatry and child and adolescent psychiatry with an active practice" and "a supervisor at an outpatient facility treating adults and children[,]" who has been "published in books." (Dkt. 65-2 at 158). The reviewer noted that symptoms of Q.M.'s diagnoses at

discharge were not the listed symptoms that resulted in his admission to BlueFire. (*Id.* at 160-61). The reviewer also noted there was no psychiatric admission note nor a comprehensive psychiatric evaluation before or during Q.M.'s stay at BlueFire to demonstrate "[Q.M.'s] symptoms could only be managed in a wilderness program." (*Id.* at 161).

BlueFire records do not support a finding that Q.M. could not have been managed at a lower level of care or that there were specific symptoms or behaviors indicating social risk. (*See* Dkt. 65-2 at 52 ("[Q.M.] had transition group and it went well and seemed very positive towards being real to gain success."), 54 ("[Q.M.] worked on communication and leadership; [Q.M.] was able to demonstrate self care and awareness of mood changes and the needs of food intake.")). Q.M.'s Master Treatment Plan's "reason for admission" acknowledged that Q.M. had sent Instagram messages trying to buy a gun, but also noted that Q.M. had stated "it was a joke, [and that] he was just bored." (*Id.* at 65). The note does not otherwise indicate that Q.M. was homicidal, suicidal, or a danger to others prior to his admission to BlueFire (*id.*), which is consistent with his BlueFire treatment records (*see id.* at 51-80). Accordingly, the Court finds it was not arbitrary and capricious for Excellus to conclude BlueFire services were not medically necessary. *See Jon N. v. BlueCross BlueShield Mass., Inc.*, 684 F. Supp. 2d 190, 204 (D. Mass. 2010) (not arbitrary and capricious to deny coverage for residential treatment facility where records indicated that claimant was stable and not homicidal, suicidal, or a danger to others, and despite prior history of "some self-mutilation, aggressive behaviors, and substance abuse," no indication claimant "displayed such behaviors within the week prior to admission").

Turning to BCA's services, Excellus also determined these services were not medically necessary because: (1) "there was not enough information to determine that [Q.M.] could not have been managed at a lower level of care such [as] psychiatric partial hospitalization or outpatient mental health treatment"; and (2) there were no "details of behavioral control, level of hostile interactions, level of refractory medication treatment or level of function specifics to demonstrate why the admission to [BCA] was medically necessary." (Dkt. 65-3 at 16).

Again, the reasonableness of Excellus's denial is confirmed by the external review sought by Plaintiffs, which upheld the denial of coverage. (Dkt. 65-5 at 120-24). *See S.M.*, 644 F. App'x at 84; *Halberg*, 2019 WL 4784571, at *19. The reviewer is a "medical doctor (MD) board certified in psychiatry and child and adolescent psychiatry with an active practice" and an "adjunct professor at a school of medicine[,]" who has been "[p]ublished in peer reviewed literature." (Dkt. 65-5 at 122). The reviewer noted that:

> [Q.M.] had been through a wilderness program for 4 weeks prior to admission and his aggression had decreased. [Q.M.] was not actively suicidal, homicidal or psychotic on admission. He was motivated for treatment and his family was supportive. While at the facility, he was actively engaged in treatment, family was involved and supportive and he was medication compliant. [Q.M.] did go to group, individual and family therapy while in residential treatment and was generally in behavioral control. He was working on coping skills for mood and social skills. [Q.M.] went on multiple passes with family which generally went well. There were no other acute medical concerns. There were no acute substance abuse concerns. He had one episode of property destruction while there, but [Q.M.] was not engaging in severe crisis behaviors to warrant around the clock monitoring from 6/30/16-6/5/17.

(*Id.* at 124).

BCA records do not support a conclusion that Q.M. could not have been managed at a lower level of care or that there were specific symptoms or behaviors indicating social risk. (*See* Dkt. 65-3 at 123 (Q.M. reports positive response to medication and "good symptomatic control," and Q.M.'s mood was "good and appropriate to psychosocial circumstances. [Q.M.] is making steady progress in therapeutic programming"), 171 (despite Q.M.'s "behavioral instability" and "marked increase in motor tics," Q.M. is "relaxed and engaging"); Dkt. 65-4 at 65 ("[Q.M.] appears to be settling into the program with[out] further escalations of behavior, which occurred earlier in the month.")).

Additionally, while at BCA, Q.M. went on multiple passes with his family which generally went well, which could reasonably be interpreted as evidence that Q.M., with the support of his family, could have managed his symptoms at a lower level of care. *See Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, No. 1:09-CV-00101 DS, 2010 WL 5300897, at *3 (D. Utah Dec. 22, 2010) (evidence that child went on "therapeutic leave for some time each month during the remainder of his stay . . . could be viewed as demonstrating that he was able to adequately care for his own needs and that his family support system was also able to fulfill those needs"), *aff'd*, 663 F.3d 1124 (10th Cir. 2011).

Significantly, Q.M.'s BlueFire therapist Charles Hancock's ("Hancock") letter undercuts Plaintiffs' argument that upon discharge from BlueFire, BCA services were medically necessary. (*See* Dkt. 65-2 at 39-40). According to Hancock:

> [Q.M.] showed progress with therapeutic treatment . . . [Q.M.] began to acknowledge his impulses before acting on them and focused on his feelings behind not being good enough . . . [Q.M.] was stabilized and has finally been placed in the appropriate setting for his mental health needs.

(*Id.*). This is consistent with BlueFire's records indicating that upon discharge, Q.M. had "accomplished significant growth in his stay," "invested in his growth in a positive manner[,]" and "[was] ready to take next step in emotional growth and maturity." (*Id.* at 73). Hancock's letter and Q.M.'s BlueFire treatment records do not support a conclusion that Q.M. could not have been managed at a lower level of care. As such, the Court finds it was not arbitrary and capricious for Excellus to conclude that BCA services were not medically necessary. *See Hurst v. Siemens Corp. Grp. Ins.*, 42 F. Supp. 3d 714, 731 (E.D. Pa. 2014) (not arbitrary and capricious to conclude residential treatment not medically necessary in light of claimant's improved symptoms and availability of treatment at a lower level of care).

Plaintiffs argue that the medical necessity letters, which were submitted as attachments to Plaintiffs' appeal of the denial of BlueFire and BCA claims, require a finding of medical necessity. (Dkt. 62 at 12-17). Specifically, Plaintiffs cite portions of the medical necessity letters to argue the Plan's medical necessity criteria were satisfied for both BlueFire and BCA services. (*See id.*). In her medical necessity letter, Dr. Sarah Atkinson, Q.M.'s former psychiatrist, stated the "need for [Q.M.] to be placed outside of the home [had] been evident since he was twelve years of age, when he first expressed aggression without remorse towards a girl in his classroom. . . ." (*Id.* at 43). However, Dr. Atkinson stopped treating Q.M. in December 2015. (*See id.*). In his letter dated February 2, 2017, Dr. David Garrison, who treated Q.M. in both his outpatient private practice and at the Child and Adolescent Inpatient Psychiatry Unit at the University of Rochester Medical Center, opined that residential care at BlueFire and BCA were "indicated from a

psychiatric standpoint." (Dkt. 65-4 at 173). However, Dr. Garrison did not note when he last treated Q.M. (*See id.*). In her letter dated January 31, 2017, Francine Newton ("Newton"), Q.M.'s former school counselor, stated that Q.M. had been transferred from a public high school to a therapeutic school, where he received individualized instruction and individual and group therapy. (*See* Dkt. 65-3 at 28; Dkt. 65-4 at 171). Newton expressed that "[Q.M.'s] mental health and history demonstrated [that] he needs a high level of care in a residential program." (Dkt. 65-2 at 46).

The letters are consistent with a finding that services at BlueFire and BCA were beneficial to Q.M. in light of his long history of mental health and behavioral problems, but they do not demonstrate that at the time of his admission to both facilities, Q.M. could not have been managed at a lower level of care. As such, it was not arbitrary and capricious for Excellus to find BlueFire and BCA services were not medically necessary, despite treatment letters expressing support for Q.M.'s placement in a residential treatment facility. *See Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1178 (D. Utah 2019) (not arbitrary and capricious to deny services as not medically necessary where although plaintiff's providers recommended residential treatment to prevent regression, plaintiff's counselor at residential treatment facility concluded plaintiff was "successfully . . . on the road to recovery and that she was no longer a risk to herself or others as she had been prior to her [admission]"); *W. v. Empire Healthchoice Assurance, Inc.*, No. 15 Civ. 5250 (CM), 2016 WL 5115496, at *16 (S.D.N.Y. Sept. 15, 2016) (not arbitrary and capricious to find services not medically necessary in light of plaintiff's recent hospitalization record indicating that she had made significant progress, despite four letters

from the plaintiff's treating physicians which discussed plaintiff's need for partial hospitalization treatment due to her medical history, prior experiences with in-patient hospitalization treatment, and failures with outpatient treatment), *aff'd*, 709 F. App'x 724 (2d Cir. 2017); *Murray v. IBM Corps.*, 557 F. Supp. 2d 444, 450 (D. Vt. 2008) (not arbitrary and capricious to discount physicians' letters written in support of plaintiff's claim that contained "only conclusory statements that conservative treatment merely provided . . . temporary relief," and did not document "a failed adequate supervised trial of conservative measures").

Plaintiffs also argue Excellus erred by not affording appropriate weight to the medical necessity letters because Q.M.'s providers had "personal knowledge of [Q.M.'s] needs based on their own interviews and examination and treatment of [Q.M.]." (Dkt. 72 at 7; *see also* Dkt. 69 at 12). However, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Nord*, 538 U.S. at 825; *see also Tansey v. Anthem Health Plans, Inc.*, 619 F. App'x 24, 26 (2d Cir. 2015) (not arbitrary and capricious to afford no "special weight" to treatment providers despite contrary opinions between treatment providers and reviewing physicians); *Greenberg v. Unum Life Ins. Co. of Am.*, No. CV-03-1396 (CPS), 2006 WL 842395, at *10 (E.D.N.Y. Mar. 27, 2006) (not arbitrary and capricious to prefer reviewing doctors despite conflicting opinions between consultative opinion and treating physicians).

Plaintiffs cite the fact that an IMEDECS reviewer subsequently reversed Excellus's denial as to Q.M.'s treatment at Daybreak Cannon, a residential treatment facility where Q.M. resided shortly after being expelled from BCA, as evidence that Excellus's decisions

to deny benefits for BlueFire and BCA were arbitrary and capricious. (Dkt. 62 at 12). The Court rejects Plaintiffs' argument for two reasons. First, the Court is limited to reviewing the administrative record. *See Miller*, 72 F.3d at 1071. Q.M.'s stay at Daybreak Cannon occurred after he stayed at BlueFire and BCA. As such, the Daybreak Cannon IMEDECS decision is not a part of the administrative record pertaining to Plaintiffs' claims for benefits in connection with BlueFire and BCA services.

Second, the reviewer had the benefit of additional evidence: on June 5, 2017, Q.M. was expelled from BCA for assault and contraband and "subsequently required residential admission due to his behavior and inability to be managed in an outpatient setting"; according to a letter dated June 8, 2017, Dr. Green, Q.M.'s treating clinician, had considered less restrictive resources and determined they were neither available nor appropriate for Q.M.'s needs, citing Q.M.'s worsening condition; and according to a University of Rochester letter dated October 26, 2017, Plaintiffs were unable to find a psychiatric outpatient provider near their residence who could adequately support Q.M.'s needs. (Dkt. 62-1 at 8). As such, contrary to Plaintiffs' assertion, the reversal of Excellus's denial as to Q.M.'s treatment at Daybreak does not demonstrate Excellus's denials of coverage for services at BlueFire and BCA were arbitrary and capricious.

Ultimately, although there may have been sufficient evidence in support of Plaintiffs' position, there is far more than a scintilla of evidence that a reasonable mind might accept as evidence adequate to support Excellus's denials. *Miller*, 72 F.3d at 1066. Accordingly, the Court finds Excellus's denials were not arbitrary and capricious.

## III.    Parity Act Claim

Plaintiffs claim Excellus violated the Parity Act by applying its medical necessity criteria in a manner that resulted in making eligibility for "subacute" mental health treatment more restrictive than for analogous medical and surgical benefits. (*See* Dkt. 62 at 17-26; Dkt. 69 at 16-23; Dkt. 72 at 9-11). For the following reasons, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact, and summary judgment is warranted in favor of Defendants.

"Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016) (citation omitted). "[T]he Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone." *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) (quotation and citation omitted). "Although there is no private right of action under the Parity Act, portions of the law are incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA." *Id.* (quotation and citation omitted).[5]

---

[5]    Defendants argue Plaintiffs' Parity Act claim must be dismissed because "where a claim for benefits exists under ERISA Section 502(a)(1)(B), Section 502(a)(1)(B) provides an adequate remedy for an injury to the plaintiffs and thus no claim under Section 502(a)(3) exists." (Dkt. 60-4 at 28-29 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512, 516 (1996)). However, the Second Circuit has expressly provided that *Varity Corp.* "did not eliminate the possibility of a plaintiff successfully asserting" a claim for the payment of benefits under § 502(a)(1)(B) and a claim for equitable relief under § 502(a)(3), and that where a participant has no remedy under another section of ERISA, as is the case here, the

The Parity Act, in relevant part, requires:

> treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan . . . and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii). Treatment limitations are defined as "limits on the frequency of treatment, number of visits, days of coverage, or other similar visits on the scope or duration of treatment." 28 U.S.C. § 1185(a)(3)(B)(iii). The regulations promulgated pursuant to the Parity Act distinguish between quantitative treatment limitations ("QTL") (numerical limitations, *i.e.*, 50 outpatient visits per year) and nonquantitative treatment limitations ("NQTL") (limitations that "otherwise limit the scope or duration of benefits for treatment under a plan"). 29 C.F.R. § 2590.712(a). "The regulations provide an illustrative list of NQTLs, which include '[r]estrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided.'" *Bushell v. UnitedHealth Grp. Inc.*, No. 17-

---

participant may assert a claim for equitable relief under § 502(a)(3). *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001). To the extent Plaintiffs seek the same type of remedy that is being sought with the § 502(a)(1)(B) claim—namely reimbursement for the expenses incurred at BlueFire and BCA—the Court agrees with Defendants that Plaintiffs cannot pursue this relief as a Parity Act claim pursuant to § 502(a)(3). *See Frommert v. Conkright*, 433 F.3d 254, 269-70 (2d Cir. 2006) (plaintiffs "seek to expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3), [but] the gravamen of [Plaintiff's] action remains a claim for monetary compensation." (citation omitted)); *Nechis*, 421 F.3d at 104 ("declin[ing] [the] invitation to perceive equitable clothing where the requested relief is nakedly contractual" and affirming dismissal of plaintiff's § 502(a)(3) claim). However, Plaintiffs also seek other forms of relief for the alleged Parity Act claim (*see* Dkt. 52 at ¶ 77), and accordingly the Court will address the merits of the claim.

CV-2021 (JPO), 2018 WL 1578167, at *5 (S.D.N.Y. Mar. 27, 2018) (quoting 29 C.F.R. § 2590.712(c)(4)(ii)(H)).

> The Parity Act is violated where:
>
> (1) the insurance plan is of the type covered by the Parity Act; (2) the insurance plan provides both medical benefits and mental-health benefits; (3) the plan has a treatment limitation—for one of those benefits that is more restrictive for mental-health treatment than it is for medical treatment; and (4) the mental-health treatment limitation is in the same classification as the medical treatment to which it is being compared.

*Id.*

Plaintiffs argue that the Plan, in the surgical and medical benefit context, covers skilled nursing facilities ("SNF") for "subacute" symptoms, but in the mental health context the Plan covers analogous residential treatment facilities only for "acute" symptoms, in violation of the Parity Act. The Court disagrees. Rather, an assessment of the Plan's language demonstrates that eligibility for benefits as to admission to SNFs and to residential treatment facilities for mental health treatment is evaluated in a comparable manner.

The Plan requires that all covered benefits, including admission to SNFs and residential treatment facilities, must be "medically necessary." (Dkt. 65-1 at 19 ("[The Plan] will provide coverage for the covered benefits . . . as long as the hospitalization, care, service, technology, test, treatment, drug, or supply . . . is Medically Necessary."), 26 ("The [Plan] will provide coverage for . . . a [SNF] if [Excellus] determines that hospitalization would otherwise be Medically Necessary.")). Under the terms of the Plan, services are "medically necessary" only if:

A.  They are appropriate and consistent with the diagnosis and treatment of your medical condition;

B.  They are required for the direct care and treatment or management of that condition;

C.  If not provided, your condition would be adversely affected;

D.  They are provided in accordance with community standards of good medical practice;

E.  They are not primarily for the convenience of you, your family, the Professional Provider, or another provider;

F.  They are the most appropriate service and rendered in the most efficient and economical way and at the most economical level of care which can safely be provided to you; and

G.  When you are an inpatient, your medical symptoms or conditions are such that diagnosis and treatment cannot safely be provided to you in any other setting (e.g., outpatient, physician's office, or at home).

(*Id.* at 19-20). In other words, admission to an SNF or a residential treatment facility is neither categorically permitted nor disallowed. Further, the applicable standard is not whether an individual's symptoms are "acute" or "subacute," but, among other things, whether the symptoms are capable of treatment in a less intensive setting.

Additionally, for both admission to SNFs and to residential treatment facilities, the Plan imposes requirements on the type of facility. Coverage for residential treatment facilities is limited to facilities defined in New York Mental Hygiene Law § 1.03(1) and, in other states, "to Facilities that are licensed or certified to provide the same level of treatment." (*Id.* at 25). Coverage for SNFs is limited to those facilities which have been "accredited as a Skilled Nursing Facility by [JACHO] or qualified as a Skilled Nursing Facility under Medicare," and which "furnish[] [services] by or under the direct supervision of licensed medical personnel." (*Id.* at 11-12). In light of the above, there is no evidence that the Plan, on its face, imposes more stringent requirements on admission to residential treatment facilities in comparison to SNFs.

Plaintiffs cite Excellus's Medical Policy 11.01.21 addressing "Skilled Nursing Facility Care for Medicare Advantage Members" ("SNF Policy")[6] as evidence that Excellus provides inpatient services for "subacute" symptoms in the medical/surgical context, but not in the mental health context. (Dkt. 62 at 18-19). The SNF Policy provides:

> The Health Plan considers direct admission to an appropriate level of care facility (e.g., SNF) as desirable for patients presenting to either a physician office or emergency room for whom it would be considered unsafe to return to their place of residence, but who do not meet criteria for admission to an acute care hospital inpatient setting; when the criteria for coverage of the admission to the facility is met.

(Dkt. 62 at 37). According to the terms of the SNF Policy, admission to an SNF is appropriate when it would be unsafe to return to one's place of residence. This language essentially requires that the claimant's medical or surgical condition cannot be managed at a lesser level of care—a level of care less than an SNF. This is analogous to the Plan's requirement that admission to a mental health residential treatment facility requires that the claimant's mental health condition cannot be managed at a lesser level of care—a level of care less than a residential treatment facility. Both standards are consistent with the Plan's basic requirement that inpatient services are covered only where treatment in a less intensive setting would not be effective. Accordingly, the SNF Policy does not raise a

---

[6]    The SNF Policy was produced, with objection, in discovery in response to Plaintiffs' request for "the medical necessity criteria utilized for skilled nursing facilities, [subacute] inpatient rehabilitation, and inpatient hospital claims from January 1, 2016 to the present." (Dkt. 68-1 at 14). Defendants contend that this policy is not relevant as there is no evidence that Excellus relied on the policy in evaluating Plaintiffs' claims for coverage. (*Id.* at 15). Although the SNF Policy was not used to deny Plaintiffs' claims, the Court finds that the policy is relevant evidence as to whether the Plan imposed a less stringent standard in determining medical necessity for admission to SNFs.

triable issue of fact as to whether the Plan's coverage for services at a residential treatment facility is more restrictive than for services at an SNF.

Plaintiffs also cite Excellus's Federal Mental Health Parity Reference Guide ("Parity Reference Guide")[7] as evidence that the Plan limits residential treatment facilities to acute symptoms. (Dkt. 62 at 20-21). The Parity Reference Guide, in relevant part, provides:

> We only cover residential services that are defined as an Intensive Level of Residential Treatment. We will not cover group homes, halfway houses or supportive housing programs. Behavioral Health will ensure that this level of care meets the program criteria for the intensive level of care in addition to meeting the medical necessity criteria.

(Dkt. 62-2 at 7). Plaintiffs summarily conclude that the Parity Reference Guide's reference to an "Intensive Level of Residential Treatment" is evidence that residential treatment facilities are limited to acute symptoms. (*See* Dkt. 62 at 20). However, the quoted language does not demonstrate that the Plan mandates "acute" symptoms for admission to a residential treatment facility. Instead, at most, the quoted language indicates that group homes, halfway houses, and supportive programs do not provide an "Intensive Level of Residential Treatment." Additionally, the policy does not otherwise define "Intensive Level of Residential Treatment." (*See id.* at 1-9). As such, Plaintiffs' argument is speculative and insufficient to raise a genuine issue of material fact.

---

[7] The Parity Reference Guide was produced, with objection, in discovery in response to Plaintiffs' request for "all manuals, guidelines, training materials, or other documents used to instruct employees about compliance with [the Parity Act] for claims involving mental health or substance use disorders." (Dkt. 68-2 at 4).

Plaintiffs further cite the Parity Reference Guide's description section which, in part, states:

> [The Parity Act] does not require that substance use coverage be added, however, distinction between inpatient & outpatient coverage is not made. Therefore, large group plans required to add NYS mandated outpatient chemical dependence benefits must add inpatient substance use coverage as a result of [the Parity Act]. *If coverage is provided, [the Parity Act] requires that the benefit is covered equal to or better than the inpatient acute hospital benefits.*

(Dkt. 62-2 at 5) (emphasis added). Plaintiffs argue that because the description compares outpatient chemical dependence benefits with inpatient acute hospital benefits, there is an issue of fact as to whether the Plan requires acute symptoms for admission to a residential treatment facility. The Court disagrees.

The Parity Reference Guide expressly provides that residential services for both substance use and mental health are subject to medical necessity. (*See* Dkt. 65-2 at 7-8). The Plan's medical necessity criteria evaluates whether the services are necessary in light of a claimant's specific symptoms and circumstances. (*See* Dkt. 65-1 at 19-20). Additionally, the Parity Reference Guide was produced in discovery in response to Plaintiffs' request for "manuals, guidelines, training materials, or other documents used to instruct employees about compliance with [the Parity Act] for claims involving mental health or substance use disorders." (Dkt. 68-2 at 4). In other words, the guide is intended to ensure compliance with the Parity Act, and it certainly does not support the conclusion that there are different evidentiary standards to determine medical necessity for mental health benefits. Consequently, "[The Parity Reference Guide] is not evidence that [D]efendants impose disparate requirements for mental health versus medical treatments

in violation of [the Parity Act]." *Tedesco v. I.B.E.W. Local 1249 Ins. Fund*, No. 14-cv-3367, 2015 WL 6509039, at *7 (S.D.N.Y. Oct. 28, 2015) ("The [Parity Act's] implementing regulations state that where mental health and medical benefits determinations are both subject to the same 'evidentiary standards . . . based on recommendations made by panels of experts' with adequate training and experience and applying 'clinically appropriate standards,' such a scheme conforms to the statute."), *vacated on other grounds*, 674 F. App'x 6 (2d Cir. 2016).

Plaintiffs essentially argue that if Q.M. manifested the equivalent subacute symptoms in the medical and surgical context, he would have qualified for admission to an SNF and, thus, "in operation" the Plan imposes more stringent requirements on mental health benefits. (*See* Dkt. 62 at 24-25). Plaintiffs' argument is speculative and without merit for at least two reasons. First, Plaintiffs' argument is based on the flawed premise that all subacute symptoms, regardless of whether for a medical, surgical, substance abuse, or mental health condition, manifest in an equivalent manner and thus all subacute symptoms necessitate inpatient treatment.[8] This would obviate the Plan's medical

---

[8]     Acknowledging subacute symptoms require varying levels of care, the Plan provides coverage for a range of services. (*See* Dkt. 65-1 at 31 (the Plan covers outpatient mental health care services, "[which include] but [are] not limited to partial hospitalization program services and intensive outpatient program services"), 58 (the Plan covers behavioral health treatment, which includes "[c]ounseling and treatment programs that are necessary to develop, maintain, or restore, to the maximum extent practicable, the functioning of an individual"), 59 (the Plan covers psychiatric and psychological care, which includes "direct or consultative services provided by a psychiatrist, psychologist, or licensed social worker")).

necessity requirement that all services be medically necessary in light of a claimant's specific symptoms and circumstances.

Second, the final rules promulgating ERISA bolster the conclusion that the Parity Act requires parity in treatment, not in outcome. The final rules contain illustrative examples of how NQTLs can impose more restrictive burdens on mental health and substance use disorder benefits without running afoul of the Parity Act. 29 C.F.R. § 2590.712(c). Example four is instructive:

> (i)   Facts . . . A plan generally covers medically appropriate treatments. For both medical/surgical benefits and mental health and substance use disorder benefits, evidentiary standards used in determining whether a treatment is medically appropriate (such as the number of visits or days of coverage) are based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved. The evidentiary standards are applied in a manner that may differ based on clinically appropriate standards of care for a condition.

> (ii)   *Conclusion* . . . the plan complies with the rules of this paragraph (c)(4) because the nonquantitative treatment limitation—medical appropriateness—is the same for both medical/surgical benefits and mental health and substance use disorder benefits, and the processes for developing the evidentiary standards and the application of them to mental health and substance use disorder benefits are comparable to and are applied no more stringently than for medical/surgical benefits. This is the result even if, based on clinically appropriate standards of care, the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions or substance use disorders as it does for any particular medical/surgical condition.

*Id.* § 2590.712(c)(4). In other words, the regulations demonstrate that there is no ERISA violation simply because the application of the same evidentiary standards results in different benefits or coverage between mental health, substance abuse, medical, or surgical conditions.

In support of their argument, Plaintiffs cite *Joseph and Gail F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259-60 (D. Utah 2016) and *A.F. v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1314 (D. Or. 2014). (Dkt. 62 at 25). However, the cases cited are consistent with the Court's own research demonstrating that cognizable Parity Act claims exist where plans categorically exclude therapies or residential treatment facilities which, in effect, are exclusions only applicable to mental health conditions. *See Gallagher v. Empire HealthChoice Assur., Inc.*, 339 F. Supp. 3d 248, 258 (S.D.N.Y. 2018) (cognizable Parity Act claim where plan included blanket exclusion for services rendered at wilderness treatment); *Munnelly v. Fordham Univ. Faculty & Admin. Hmo Ins. Plan*, 316 F. Supp. 3d 714, 734 (S.D.N.Y. 2018) (cognizable Parity Act claim where plan categorically excludes residential treatment services). In contrast, here, Defendants did not categorically exclude coverage for residential mental health treatment. As such, these cases do not support Plaintiffs' contention that a disparate result alone constitutes a Parity Act violation.

Courts have recognized that conclusory allegations are insufficient to sustain a Parity Act claim on a motion to dismiss. *See Richard K. v. United Behavioral Health*, No. 1:18-cv-6318-GHW, 2019 WL 3080849, at *11-12 (S.D.N.Y. July 15, 2019) (allegations without factual basis to support plaintiffs' claim that that there was a disparate treatment in the way the defendants "handled, processed, or evaluated" claims for mental health treatment in comparison to SNFs and inpatient rehabilitation facilities insufficient to state Parity Act claim); *Anne M. v. United Behavioral Health*, No. 2:18-CV-808TS, 2019 WL 1989644, at *3 (D. Utah May 6, 2019) (plaintiffs' allegations that plan "imposed greater restrictions on residential treatment for mental health than it did for facilities, such as

skilled nursing homes," was devoid of factual support for their claim that the plan "applied less rigorous standards when evaluating analogous medical/surgical claims" and thus were insufficient to state Parity Act claim). That principle is even more applicable on a motion for summary judgment. Here, Plaintiffs' conclusory allegations, absent evidence that Excellus applied more rigorous medical necessity criteria when evaluating claims for mental health benefits, cannot survive summary judgment.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Dkt. 60) and denies Plaintiffs' motion for summary judgment (Dkt. 63).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:     March 19, 2020
           Rochester, New York

- 34 -